UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SOUTHEAST FINANCIAL CREDIT UNION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 1:15-cv-01507-LJM-TAB |
| THE COLLEGE NETWORK, INC., MARK IVORY, GARY L. EYLER, ETEST OUT LEARNING SYSTEMS, LLC, CAREER LEARNING & ACADEMIC SUPPORT SERVICES, LLC, and GARY FAIR, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANT GARY FAIR'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court on Defendant Gary Fair's ("Fair's") Motion for Partial Summary Judgment.  Dkt. No. 135.  Fair requests that the Court dismiss Count I of Plaintiff Southeast Financial Credit Union's ("SFCU's") Complaint, alleging breach of contract, as it relates to him individually.  Dkt. No. 136 at 1.  SFCU, however, opposes Fair's Motion for Partial Summary Judgment, arguing that (1) the corporate veil of The College Network, Inc. ("TCN"), should be pierced to render Fair, a former Vice President of TCN, personally liable for TCN's breaches of contracts formed between TCN and SFCU; and (2) Fair participated in a civil conspiracy to facilitate TCN's breaches of contract.  *See generally*, Dkt. No. 175.

For the reasons stated herein, the Court **GRANTS** Fair's Motion for Partial Summary Judgment.

1

## I. <u>BACKGROUND</u>

TCN was formed in 1995 by Gary L. Eyler ("Eyler"). Dkt. No. 137, Ex. 1 ("Fair Aff."), Ex. A. TCN's main business was selling online study materials to college students to help them test out of particular classes required for their degrees. Dkt. No. 175, Ex. 2 ("Fair CLASS Dep."), 65:20-23.

To purchase TCN's products, most TCN customers obtained financing from external financial sources. *Id.* at 46:19-47:5. TCN entered into two agreements with SFCU, dated July 21, 2003, and May 30, 2014, respectively, through which SFCU agreed to provide financing to TCN's customers to help them purchase TCN's educational products (the "Agreements"). Dkt. No. 1, Ex. A & B. Under the Agreements, SFCU deposited the full amounts it financed to TCN customers into accounts TCN maintained with SFCU. *Id.* at ¶ 3. If a TCN customer canceled or defaulted on its loan from SFCU, the Agreements required TCN to pay SFCU the amount owed on that loan through its SFCU reserve account ("Chargebacks"). *Id.* at ¶ 3d.

Fair was hired by Eyler in 2006, as TCN's Vice President, Western Regional Officer. Fair CLASS Aff., 41:24-42:9. Fair was responsible for managing TCN's operations in Las Vegas, Nevada, including TCN's financial services and customer support operations. *Id.* In 2011, Fair's job title changed to Vice President of Call Center Operations, which required him to manage all of TCN's customer support services. *Id.* at 48:5-13. Fair was listed as an officer of TCN with the Nevada Secretary of State for a period of time between March 2006 and May 13, 2016. Dkt. No. 175, Ex. 7 at 3.

As Vice President of Call Center Operations for TCN, Fair was not involved in TCN's relationships with its finance partners and was not privy to TCN's contracts with its

finance partners.  Fair CLASS Dep., 47:16-18; 53:21-23.  Fair was not a party to the Agreements and did not personally guaranty the Agreements.  Fair Aff., ¶¶ 9-10.  Fair was also not involved in negotiating the Agreements with SFCU and had no knowledge of their specific terms prior to the start of this litigation.  *Id.* at ¶ 11.  Furthermore, Fair had no access to TCN's reserve accounts and had no authority to make payments from TCN's accounts with SFCU or to make decisions regarding TCN's deficits in its SFCU reserve account.  *Id.* at ¶¶ 14, 19-20.

In January 2014, TCN began experiencing financial difficulties, and failed to pay SFCU Chargebacks, which constituted a breach of the Agreements.  Dkt. No. 1, ¶¶ 27-33; Dkt. No. 120, ¶¶ 29-35.  On November 14, 2014, SFCU held a teleconference with TCN representatives, including Fair, and sent TCN a "Cease and Desist" letter in order to address TCN's negative balance and to demand that TCN stop making loan arrangements with SFCU's borrowers.  Fair Aff., ¶ 21.

On January 8, 2015, Eyler sent an email to various TCN managers, including Fair, regarding TCN's poor financial condition and announced the formation of the "Rapid Rebuild Committee," which was tasked with forming a plan to stop TCN's financial decline.  Fair Aff., Ex. B.  The Rapid Rebuild Committee was comprised of outside consultant Ken Knapik, Eyler, and eight TCN executives, including Fair.  Fair Aff., Ex. D.  While Fair claims to not understand all of the factors that caused TCN's financial issues, it became apparent to Fair by the summer of 2015 that TCN could not survive.  Fair CLASS Dep., 63:22-64:6.

The Rapid Rebuild Committee created a business plan, which included the sale of TCN's main asset, the online portal used for its educational products (the "Portal").  Dkt.

No. 175, Ex. 1 ("Fair eTest Out Dep."), 176:17-177:15. TCN planned to sell the Portal to eTest Out Learning Systems LLC ("eTest Out"). *Id.* at 178:10-170:2. eTest Out is a Nevada limited liability corporation that was formed on June 8, 2015, with the intention of selling study materials to individuals in the nursing industry to help them earn college credit. *Id.* at 51:9-15; Fair Aff., Ex. J. Eyler owns 70% of eTest Out and acts as eTest Out's Chief Executive Officer. Dkt. 175, Ex. 4 ("Eyler eTest Out Dep."), 96:20-97:1; Fair eTest Out Dep., 216:18-218:25. Fair was appointed Chief Operating Officer of eTest Out in late 2015 and has a small ownership interest in that company. Fair eTest Out Dep., 55:22-23; Eyler eTest Out Dep., 80:4-15. eTest Out intended to purchase the Portal from TCN for $1,246,000.00 through a promissory note funded by eTest Out's expected sales revenue. Fair eTest Out Dep., 188:20-24.

The Rapid Rebuild Committee's business plan also included the creation of a support mechanism to handle TCN's customer service operations. Fair CLASS Dep., 63:22-64:8. Career Learning & Academic Support Services, LLC ("CLASS"), was created as a Nevada limited liability corporation on July 29, 2015. Dkt. No. 139, Ex. 2. CLASS was meant to provide TCN's customers with customer support services after TCN could no longer provide such services. Fair eTest Out Dep., 125:18-20. Eyler is the sole grantor, trustee, and beneficiary of the CLASS Management Trust, which is the Manager and sole member of CLASS. Fair CLASS Dep., 94:5-16. Eyler is also the Chief Executive Officer of CLASS. *Id.* at 89:3-90:11. Fair was named the successor trustee of the CLASS Management Trust and acted as the initial Chief Operating Officer of CLASS until November 2015. *Id.* at 12:2-6; 95:3-6. Fair is currently the Senior Vice President for

CLASS.  *Id.* at 90:12-13.  Additionally, CLASS is wholly owned by eTest Out.  Fair Aff., Ex. H.

When formulating its business plan, the Rapid Rebuild Committee assumed that each of the finance companies providing loans to TCN's customers would be willing to enter into a Customer Services Agreement with CLASS in order to provide their borrowers with continued access to the Portal.  *Id.*  Under the Customer Services Agreement, each finance company would be required to pay CLASS a service fee of $7.00 per month for each active loan account it has with TCN, in exchange for CLASS's support services for the Portal.  *Id.*; Fair CLASS Dep., 139:4-25.  Fair presented SFCU with the business plan developed by the Rapid Rebuild Committee and the proposed Customer Services Agreements on September 9, 2015.  Fair Aff., Ex. E.  Fair was also present when Eyler explained to SFCU that TCN was going out of business due to its financial problems and could no longer provide customer support services to SFCU's borrowers.  Fair Aff., ¶ 23.  TCN ceased its operations in October 2015.  Fair CLASS Dep., 52:3-20.

SFCU filed this action on September 25, 2015, seeking actual and punitive damages, as well as injunctive relief to prevent the Defendants from restricting SFCU's customer's access to the Portal[1].  Dkt. No. 1.  SFCU alleged, among other things, that

---

[1] On April 21, 2016, We Florida Financial, another financing company that had contracted with TCN to provide loans to TCN's customers, agreed to purchase the Portal from TCN and CLASS for $1,175,000.00.  Dkt. No. 100, ¶ 8.  We Florida Financial also agreed to provide TCN's customers receiving loans from SFCU access to the Portal, pending the Court's approval of the sale, in an Access Agreement with SFCU dated March 30, 2016. *Id.* at ¶ 9.  The Court approved the sale of the Portal to We Florida Financial on April 29, 2016.  *See generally*, *Id.*  Based on this sale and We Florida Financial's agreement to provide SFCU's customers with access to the Portal, SFCU's prior Motion for a Temporary Restraining Order and Preliminary Injunction, Dkt. No. 9, was rendered moot. Dkt. No. 100.

TCN breached its contracts with SFCU.  *Id.*  On December 21, 2015, in response to SFCU's Motion for Judgment on the Pleadings, TCN admitted that it was liable to SFCU for breaching the Agreements, and this Court ordered that TCN was liable for SFCU for breach of contract, pending a determination of damages.  Dkt. No. 64; Dkt. No. 88.  In addition to seeking liability against TCN for breach of contract, SFCU also seeks to hold Fair liable for TCN's breaches by employing piercing the corporate veil and civil conspiracy theories.  Dkt. No. 1.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in relevant part: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, (1986).  The nonmoving party

bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

# III. ANALYSIS

## A. FAIR'S PERSONAL LIABILITY FOR BREACH OF CONTRACT

Even though Fair was employed as a Vice President of TCN when the Agreements were formed, Fair was not involved in the formation of the Agreements individually or as an agent of TCN.  Fair Aff., ¶ 11.  Fair was not a party to the Agreements, and was not involved in the negotiation, signing, or implementation of the Agreements; the only parties to the Agreements are SFCU and TCN.  *See generally*, Agreements.  Because Fair was not a party to the Agreements and is not individually bound by them, he cannot be directly, personally liable for any breach of the Agreements.  *See Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1231 (Ind. 1994) ("Corporate officers and shareholders are generally not personally liable for the contractual obligations of the corporation.").  Therefore, the only way that SFCU could impose personal liability on Fair for breach of the Agreements is by piercing TCN's corporate veil.

SFCU argues that Fair's conduct justifies piercing TCN's corporate veil to hold Fair individually liable for TCN's breach of the Agreements because "Fair was an indispensable part of Eyler's scheme to manipulate TCN's corporate form so as to render it judgment proof."  Dkt. No. 175 at 12-14.  Fair, however, asserts that piercing TCN's corporate veil is improper because there is no causal nexus between Fair's alleged misuse of the corporate form and TCN's breaches of the Agreements.  Dkt. No. 136 at 19-24.

Indiana courts are generally "reluctant to disregard corporate identity" by piercing the corporate veil and will do so "'only where it is clear that the corporation is merely a shell for conducting the defendant's own business and where the misuse of the corporate

8

form constitutes a fraud or promotes injustice.'" *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, 722 F. Supp. 2d 1015, 1031 (N.D. Ind. 2010) (quoting *Comm'r, Dep't. of Envtl. Mgmt. v. RLG, Inc.*, 744 N.E.2d 556, 563 (Ind. 2001)).  A party seeking to pierce the corporate veil under Indiana law has the "severe" burden of "prov[ing] by a preponderance of the evidence 'that the corporate form [1] was so ignored, controlled or manipulated that it was merely the instrumentality of another and [2] that the misuse of the corporate form would constitute a fraud or promote injustice.'" *Escobedo v. BHM Health Assoc., Inc.*, 818 N.E.2d 930, 933-35 (Ind. 2004) (quoting *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)).  In determining whether a party seeking to pierce the corporate veil has met its burden, the Court generally considers "whether the corporate form has been adhered to, whether corporate assets are treated as such or as personal assets, and whether there has been an attempt to deceive third parties."  *Winkler*, 638 N.E.2d at 1232 (citations omitted).  A party seeking to pierce the corporate veil must also demonstrate a causal connection between the alleged misuse of the corporate form and the harm suffered as a result of the misuse.  *See JMB Mfg., Inc. v. Child Craft, LLC*, 939 F. Supp. 2d 909, 919 (S.D. Ind. 2013); *see also*, *CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276, 1282-83 (Ind. Ct. App. 2012) ("the fraud or injustice alleged by a party seeking to pierce the corporate veil must be caused by, or result from, misuse of the corporate form").

While SFCU argues that its financial losses and inability to recover from TCN, rather than TCN's breach of the Agreements, are harms sufficient to pierce TCN's corporate veil, Dkt. No. 175 at 17, a mere "[l]ack of other recourse simply is not a proper basis for piercing the corporate veil."  *Country Contractors, Inc. v. A Westside Storage of*

*Indianapolis, Inc.*, 4 N.E.3d 677, 691 (Ind. Ct. App. 2014).  Without a causal connection between Fair's alleged misuse of TCN's corporate form and the harm SFCU sustained as a result of TCN's breaches of the Agreements, SFCU cannot pierce TCN's corporate veil to hold Fair individually liable for TCN's breaches.  *See Gates*, 962 N.E.2d at 1282-83.

SFCU has failed to provide evidence demonstrating a causal nexus between Fair's conduct and the harm SFCU sustained from TCN's breaches of the Agreements.  SFCU points to the facts that, starting in January 2015, Fair helped formulate Rapid Rebuild Committee's business plan, which included the sale of the Portal to eTest Out and the creation of CLASS as a new support mechanism, and that he helped form eTest Out and CLASS entities.  Dkt. No. 175 at 4-6.  However, TCN began breaching the Agreements in January 2014, a year before the Rapid Rebuild Committee was formed and more than eighteen months before either eTest Out or CLASS was created.  Dkt. No. 1, ¶ 31; Fair Aff., Exs. B, J; Dkt. No. 139, Ex. 2.  Furthermore, SFCU fails to demonstrate that Fair was otherwise involved in the negotiation or implementation of the Agreements in any way or that Fair induced any breach of the Agreements prior to January 2015.

SFCU also argues that Fair and Eyler operated several distinct businesses, including eTest Out, CLASS and TCN, as a single enterprise and that Fair's role in the operation of this single enterprise supports piercing TCN's corporate veil.  Dkt. No. 175 at 16.  While an Indiana court may disregard the separate nature of affiliated corporate entities when they are managed as a single entity, *see Reed v. Reid*, 980 N.E.2d 277, 302 (Ind. 2012), this does not justify piercing TCN's corporate veil in this instance.  Neither eTest Out nor CLASS existed at the time TCN allegedly began breaching the Agreements, and SFCU has not shown how Fair's connections with eTest Out and

10

CLASS relate to TCN's breaches of contract.  Therefore, there is no evidence that TCN, eTest Out, and CLASS acted as a single entity to breach the Agreements.

Moreover, citing *Fairfield Development, Inc. v. Georgetown Woods Senior Apartments L.P.*, SFCU asserts that Fair had sufficient authority over TCN and its affiliated companies to justify piercing TCN's corporate veil.  768 N.E.2d 463 (Ind. Ct. App. 2002); Dkt. No. 175 at 13-14, 17.  The court in *Fairfield* held that a particular company's corporate veil could be pierced to reach the company's former president, who no longer acted as an officer, director, or shareholder of the company but nevertheless acted as its principal figure, because the company served as the former president's alter ego.  *Fairfield*, 768 N.E.2d at 473.  The court in *Fairfield* also allowed the plaintiff to pierce the company's corporate veil to reach the former president's wife, who was a director of the company, had personally guaranteed the company's loans, and possessed a small ownership interest in the company.  *Id.* at 466, 473.

SFCU's reliance on *Fairfield* is misplaced because the facts as to Fair do not compare to either the former president or his wife.  Despite having greater control over eTest Out and CLASS, Fair never had a level of control over TCN to which he could reasonably be viewed as TCN's principal figure and had no control of TCN in relation to the Agreements.  Fair also never guaranteed TCN's contracts nor had an ownership interest in TCN.  Therefore, TCN cannot be considered Fair's alter ego, and SFCU cannot pierce TCN's corporate veil to reach him individually on its breach of contract claim.

## B.  CIVIL CONSPIRACY

SFCU also seeks to impose liability on Fair by claiming that Fair participated in a civil conspiracy to cause TCN's breaches of the Agreements.  Dkt. No. 1, ¶ 62, 74; Dkt.

No. 175 at 18-21.  A civil conspiracy under Indiana law is defined as "a combination of two or more persons who engage in a concerted actions to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means."  *Birge v. Town of Linden*, 57 N.E.3d 839, 845 (Ind. 2016) (internal quotations omitted).  While no separate cause of action for civil conspiracy is recognized in Indiana, a plaintiff may seek an action for damages resulting from a civil conspiracy.  *Best Chair Inc. v. Factory Direct Wholesale, LLC*, 121 F. Supp. 3d 828, 839 (S.D. Ind. 2015).  Because there is no independent cause of action in Indiana for civil conspiracy, a claim of civil conspiracy is generally alleged along with an underlying tort.  *Birge*, 57 N.E.3d at 846 (citing *Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d 646, 653 (Ind. Ct. App. 2014)).  However, "the law in Indiana is not clear-cut" as to whether a breach of contract claim can support a claim of civil conspiracy.  *Carter v. State Farm Fire & Cas. Co.*, 850 F. Supp. 2d 946, 953 (S.D. Ind. 2012).

The Court need not determine whether a civil conspiracy claim can be alleged with an underlying claim for breach of contract at this time because, even if such a claim was recognizable under Indiana law, SFCU has not provided sufficient facts to support it.  SFCU has not alleged any specific facts or provided any evidence demonstrating that Fair used any unlawful means to achieve TCN's breaches of the Agreements, as is required to meet the definition of a civil conspiracy.  *See Birge*, 57 N.E.3d at 845.  Even if SFCU could provide evidence to prove that Fair encouraged TCN to breach the Agreements, Fair, as a Vice President of TCN, could "not [be] liable for inducing [TCN's] breach of its contract if [he] act[ed] within the scope of his official duties on behalf of [TCN] and not as an individual for his own advantage."  *Winkler*, 638 N.E.2d at n. 7.  Because SFCU has failed to provide any evidence that Fair acted illegally or outside the scope of his official

12

duties to effectuate TCN's breaches of the Agreements, Fair cannot be held liable to SFCU for civil conspiracy.

## IV.  **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Fair's Motion for Partial Summary Judgment.

IT IS SO ORDERED this 27th day of February, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution:

Alexander Pape Orlowski
BARNES & THORNBURG LLP
(Indianapolis)
aorlowski@btlaw.com

Karoline E. Jackson
BARNES & THORNBURG LLP
(Indianapolis)
kjackson@btlaw.com

Michael K. McCrory
BARNES & THORNBURG LLP
(Indianapolis)
mmccrory@btlaw.com

Christopher Charles Hagenow
BLACKWELL, BURKE & RAMSEY, P.C.
chagenow@bbrlawpc.com

Jason R. Burke
BLACKWELL, BURKE & RAMSEY, P.C.
jburke@bbrlawpc.com

Jonathan Andrew Knoll
COHEN & MALAD LLP
jknoll@cohenandmalad.com

Michael Wesley McBride
COHEN & MALAD LLP
mmcbride@cohenandmalad.com

Richard M. Malad
COHEN & MALAD LLP
rmalad@cohenandmalad.com

Donald F. Foley
FOLEY & ABBOTT, P.A.
donf@foleyandabbott.com

Tony H. Abbott
FOLEY & ABBOTT, P.A.
tabbott@foleyandabbott.com

Harley K Means
KROGER GARDIS & REGAS LLP
hkm@kgrlaw.com

James A. Knauer
KROGER GARDIS & REGAS, LLP
jak@kgrlaw.com

Amanda D. Stafford
NEXTGEAR CAPITAL INC.
amanda.stafford@nextgearcapital.com

Stephen B. Gillman
SHUTTS & BOWEN LLP
sgillman@shutts.com

Trent L. Richards
THE BOURASSA LAW GROUP, LLC
trichards@bourassalawgroup.com

Andrew A. Warth
WALLER LANSDEN DORTCH & DAVIS,
LLP
drew.warth@wallerlaw.com

Chanelle R. Acheson
WALLER LANSDEN DORTCH & DAVIS,
LLP
chanelle.acheson@wallerlaw.com

Jeremy A. Oliver
WALLER LANSDEN DORTCH & DAVIS,
LLP
jeremy.oliver@wallerlaw.com

John E. Haubenreich
WALLER LANSDEN DORTCH & DAVIS,
LLP
john.haubenreich@wallerlaw.com